IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 23, 2017 Session

## GREAT AMERICAN OPPORTUNITIES, INC. v.
## BRAD PATTERSON, ET AL.

### Appeal from the Chancery Court for Davidson County
### No. 11-1419-IV      Russell T. Perkins, Chancellor

_____

### No. M2016-02034-COA-R3-CV

_____

This is a breach of contract action in which the plaintiff employer filed suit against its employee, claiming that he was liable for balances on his commission and sales accounts and for breach of loyalty pursuant to the terms of the employment agreement. Following a bench trial, the court ruled in favor of the employee and ordered the employer to direct the redemption of his stock held in the parent company. We reverse, in part, and hold that the parent company is not obligated to redeem the stock and that the employer is entitled to $15,000 in damages for unearned compensation as a result of the employee's breach of loyalty. The court's judgment is affirmed in all other respects. We remand for the collection of attorney fees and costs.[1]

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Reversed in Part, Affirmed in Part; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J. and ANDY D. BENNETT, J., joined.

Paul S. Davidson, Laura P. Merritt and William Randall O'Bryan, Jr., Nashville, Tennessee, for the appellant, Great American Opportunities, Inc.

Brad Patterson, Hixson, Tennessee, pro se.

_____

[1] The case under submission presents similar issues addressed by this court in *Great American v. Brigman*, No. M2016-02035-COA-R3-CV, which we decided in a separate opinion after denying motions for consolidation on appeal.

## OPINION

## I. BACKGROUND

Great American Opportunities, Inc. ("GAO"), founded in 1974, provides services and products to promote fundraising activities for schools and civic organizations. GAO is a subsidiary of Southwestern/Great American, Inc. ("Southwestern"), a separate legal entity and a Tennessee corporation. GAO employs commissioned sales representatives who work with individuals within participating schools and organizations to promote fundraising efforts. Brad Patterson ("Employee") worked for GAO as a sales representative from February 2003 through June 16, 2011.

GAO claimed that it provided Employee with a contract entitling him to a guaranteed draw plus earned commissions for his first two years of employment. GAO asserted that upon the expiration of his initial two-year term, Employee would then be entitled to an unguaranteed draw against earned commissions paid in accordance with a yearly Pay Plan. Employee would also then be responsible for certain business expenses maintained on an open account, referred to by the Parties as the "8000 account."[2] Further, Employee was also then liable for his balance on an open commission account that documented cash advances provided in excess of his actual earned commissions – referred to by the Parties as an overdraw.

The contract at issue provided, in pertinent part, as follows:

Compensation

(a)     For all services rendered by Employee under this Agreement, [GAO] shall compensate him/her in accordance with the Compensation Schedule which is attached hereto as Exhibit A, and which shall be deemed for all purposes to be an integral part of this Agreement.

(b)     Each fiscal year during the term of this Agreement, [GAO] shall cause to be executed in writing a new Compensation Schedule and Sales Representative's Pay Plan, effective July 1 of the new corresponding year, indicating the amount of compensation and the method for payment of said compensation for the services of Employee during the following fiscal year beginning July 1st. The new Compensation Schedule shall be considered a part of this Agreement and shall be known as Exhibit A for the corresponding year. In conjunction with each new fiscal year, [GAO] will

---

[2] The 8000 account documented advances and business allowances made for merchandise, promotional aids, marketing pieces, and mailings used for the promotion of fundraisers.

advise Employee of *his/her applicable Pay Plan to be set forth in a written Notification given in accordance herewith comparable in form to the Addendum made a part hereof*.

\* \* \*

Modification and Waiver of Breach.      No waiver or modification of this Agreement shall be binding unless it is in writing, signed by the parties hereto.  No waiver of a breach hereof shall be deemed to constitute a waiver of a further breach, whether of a similar or dissimilar nature.

\* \* \*

Entire Agreement.  This Agreement constitutes the entire understanding between the parties with respect to the subject matter hereof, superseding all prior discussions, representations and preliminary agreements, whether written, oral or implied.  This Agreement will not be amended or modified except in writing executed by the parties.

(Emphasis added.).  A Notification of Pay Plan, dated February 14, 2003, was attached to the contract and signed by the Parties.  The document provided as follows:

Exhibit A
Notification of Pay Plan

\* \* \*

**Compensation in First Year**

**Monthly Compensation**:  Employee will receive monthly compensation of $13,542 for the term [beginning February 17, 2003, and ending February 16, 2004].

**Bonus Compensation Opportunity**:  For any business booked over the $300,000 net wholesale target outlines above, [GAO] will pay [Employee] a bonus of 10% of the excess net wholesale.  The bonus will be accrued at the time the net wholesale is recorded on the books of the company and payable to [Employee] no later than 30 days after the end of the season in which the bonus compensation was accrued.

- 3 -

**Compensation in Second Year**

In the event that [Employee's] Employment Agreement is renewed for the year following the term of his Notification, [Employee] will continue to receive this monthly compensation. However, in that year, $2,500 of the monthly compensation will be considered salary. The remainder of the monthly compensation will be a guaranteed draw against commissions, bonuses and allowances earned. If aggregate commissions, bonuses and allowances earned as outlined below exceed the aggregate monthly compensation amounts, [GAO] will pay [Employee] excess amount. If, however, the amounts earned do not exceed aggregate monthly compensation amounts, the shortfall (overdraw) will NOT be due and payable to [GAO].

For all lines of business except Magazines, [Employee] will [] *earn commissions, bonuses and allowances* according to the Company's Experienced Pay Plan in effect at that time. For Magazines, [Employee] will earn commission of 25% of aggregate base wholesale. [Employee] will also earn a bonus of $1.00 for each subscription sold in excess of a base subscription amount to be determined at the time the Employee's employment with [GAO] commences.

(Emphasis added.). The Pay Plans referenced in Exhibit A were not signed by the Parties but were mailed to Employee. The Pay Plans contained the following general terms that remained unchanged throughout Employee's tenure with GAO:

7. <u>Compensation And Draw</u>. [Employee] will receive a monthly compensation, payable semi-monthly, a portion of which may be a base compensation with any remaining amount to serve as an advance or a "draw" against commissions and bonuses earned during the fiscal year as defined in the new hire and experienced sections of this pay plan. For each fiscal year, [Employee]'s applicable Notification of Pay Plan will also note his/her compensation and draw.

8. <u>Adjustments To Compensation And Draw</u>. [GAO] may at its discretion adjust or discontinue [Employee's] monthly compensation at any time if, in the opinion of [GAO] management, [Employee] has not performed at an acceptable level.

9. <u>Draw In Excess of Commission</u>. If at any time the draw paid to [Employee] exceeds commissions earned by more than the amount approved by management, [Employee] may not be paid any additional draw

until the excess amount is within approved limits. However, if such a draw is allowed, [GAO] may, at its option, recover the entire aggregate excess draw above commission and bonuses as, among other things, a debt on open account or offset such aggregate excess draw against bonuses, compensation and/or commissions, as the case may be.

* * *

14. [Employee's] 8000 Account. [GAO] will provide [Employee] monthly invoices and statements detailing charges to [Employee's] account with [GAO] (the "8000 account"). All charges to [Employee's] account will be reconciled and paid each month. [Employee] must notify Customer Service of billing errors within 60 days of receipt of the applicable monthly statement. Failure to do so constitutes acceptance of charges invoiced.

* * *

17. Year-End Settlement of Accounts. All amounts due [GAO] at fiscal year-end may be withheld from bonuses and any other compensation amounts that would normally be paid to [Employee] by August 31 following the close of that fiscal year. These amounts due include but are not limited to draws paid in excess of commission earned, advances in excess of expense allowance earned and charges made to [Employee's] 8000 account. If these compensation amounts due to [Employee] are not sufficient to cover amounts due to [GAO], the excess is due and payable . . . by August 31 following the end of the fiscal year. Or [GAO] may, at its option, offset such amounts as set forth in Paragraph 9.

According to GAO, Employee was not responsible for his 8000 account or any overdraw for his first two years of employment based upon his specific offer of employment. Beginning in 2005, GAO provided Employee with invoices documenting his 8000 account balance. Employee never reconciled his 8000 account as provided for in the yearly Pay Plans; however, he made a payment of $14,000 on the account in June 2008. GAO also withheld some of his earnings, referred to as "C-Prize" money, in an attempt to reconcile his account liability. Employee resigned on June 16, 2011, with an outstanding balance of $149,497.67 on his commission account and $98,155.85 on his 8000 account.

GAO filed suit for breach of the employment agreement and quantum meruit. As pertinent to this appeal, GAO claimed that Employee was liable for the balance on the

commission account and the 8000 account and that he had breached his duty of loyalty and good faith by:

> (a)    filing false and fraudulent expense reports concerning work purportedly performed by [him], through his spouse, for [GAO];

> (b)    falsely representing to [GAO his] intention to remain with [GAO] in the Fall of 2011;

> (c)    contacting [GAO] customers, while still employed by [GAO], and soliciting the transfer of customers' business to [him] or [his] new business venture.

GAO claimed that Employee was also liable for wrongful inducement to breach contract by encouraging Shannon Coley, a fellow employee, to breach his contract and join him in a business venture and for misrepresentation and/or fraud, for civil conspiracy by working with Mr. Coley to solicit business.[3]  Lastly, GAO claimed that Employee was jointly and severally liable for the wrongful acts of Mr. Coley.  GAO sought a judgment in the amount of $247,653.52, plus prejudgment interest, legal fees, and costs for the balance remaining on the commission and 8000 accounts.  GAO also requested damages directly and proximately caused by the breach of Employee's duty of loyalty.  The parties later entered into a stipulation prior to trial providing that the court "shall determine the entitlement to, if any, as well as the amounts, of any awards of attorneys' fees and costs."

Employee denied liability, claiming that he had been advised that he was not and would never be held liable for any balance held on his commission and 8000 accounts. He filed a counter-complaint, in which he asserted, inter alia, claims of fraudulent inducement, negligent misrepresentation, fraud, unjust enrichment, and violations of the Tennessee Consumer Protection Act and the Tennessee Securities Act of 1980.  His claims related to promises made to him upon his hiring and his participation in the company stock program.  He also requested an accounting to enable him to determine the value of his stock investment.  He later amended his counter-complaint to add Southwestern as a counter-defendant.

The case proceeded to trial in January 2015.  James Ring testified that he left Quality School Plans ("QSP"), a similar fundraising business, to start a magazine division

---

[3] GAO also filed suit against Mr. Coley, who is not a party to this appeal.  GAO and Mr. Coley reached an agreement following the entry of the court's final order and sought an order of dismissal from this court.  We granted the request and dismissed the appeal as it pertained to Mr. Coley.

at GAO in 2002.[4] He recalled initially working with Rob Corley, Neil Arnold, Jean Laise, and Kurt Gengenbach, all former QSP employees who joined GAO to develop the magazine division. They referred to themselves as the "magazine team" but did not have formal titles at the time. He stated that Employee and James Brigman were among the first potential hires invited to interview in Nashville. He stated further,

> [A] typical day would have a potential candidate arrive first thing in the morning, we would pick them up at the airport, or if they drove, obviously, we did not have to do that. And we would have them taken on a tour of Southwestern facilities to see various companies within Southwestern to see how it operated, to learn a little bit about its history.
>
> Then I would take over and interview them to find out more about them and why they would even want to join us. Would talk about what they could expect if they joined us over their first two years and then on into the future.
>
> I would have [Mr. Corley] in marketing spend time with the candidate discussing our various programs, many on the magazine side that we didn't even have at the time. So we had to tell him where we were going.
>
> We would have [Mr. Arnold] talk a little bit about operations and how this company functioned. I would ask [Ms. Laise] to talk to them about our benefit plans, because I'm from Canada. I just wasn't familiar with that part of it.
>
> Then, later in the day, they would sit with Tom McDowell, the [P]resident of the company at the time. And Tom is a real, real people person, and he would spend at least an hour with these candidates. He would explain our stock plan to them and our profit sharing. That's the part he always liked to talk about, the wealth accumulation piece.
>
> * * *
>
> And then I would get together with them and see how interested they were and make sure they understood our commission structure and so forth.

---

[4] Mr. Ring is currently the executive vice president and director of sales for QSP, Canada, which is now a subsidiary of GAO.

And then they would leave, and we might actually on the spot say, we would like to hire you, and you go home and think about it. We'll get a contract put together and sent out.

He explained that GAO offered those leaving QSP to start the magazine division a 25 percent commission rate for magazine sales, a salary, and an automobile reimbursement plan, referred to as the Runzheimer program.

Mr. Ring identified the Employment Agreement at issue and discussed the specific compensation schedule offered to Employee. He further noted that Employee was bound by a duty of loyalty that required him to use his "best efforts" in promoting and soliciting business for GAO. He recalled that Employee was responsible for a territory comprised of certain parts of Northern Georgia and Southeastern Tennessee and that with the exception of his first year of employment, Employee stayed within that territory. Employee never advised him that the Pay Plans did not apply or that he was not receiving payment in accordance with the Employment Agreement.

Mr. Ring acknowledged that the compensation structure was unique because those coming from QSP were precluded from selling in their previous territory for the first year. The first year, salary was determined based upon prior sales averages with QSP. The second year, representatives were still provided a salary "guarantee" because GAO recognized that there was an adjustment period when the representative returned to his or her previous territory. He explained that the representatives received the same amount of money but that it was broken into two sections – a $30,000 salary and a sales-based commission. He further acknowledged that the new hires were not responsible for charges on the 8000 account for those first two years. He stated,

> After year two, it became part of the regular compensation system with salary, commissions, bonuses, et cetera. There was one exception, though, and I couldn't tell you the exact years. For a few years in there, the magazine group that came over from [QSP] were getting the 25 percent, and there was a lower percentage paid to [the existing GAO representatives] who were just learning the business.[5]

Other than the commission "bonus", the sales representatives in the magazine division were paid as outlined in the Pay Plans provided to all employees. He identified the Pay Plan allegedly applicable to Employee and acknowledged that the Pay Plan did not indicate the amount of his compensation. He explained that the plans outlined the

---

[5] He asserted that the 25 percent commission rate was finally incorporated in the 2008/2009 Pay Plan and applicable to all employees in the magazine division.

commission amounts applicable to each individual but did not contain a salary component applicable to Employee.

Mr. Ring described the 8000 account as follows:

It is an account . . . where representatives can charge various items; for instance, maybe they purchase some samples, charge it to that account. They may want to take advantage of a system where they could have their brochure packets for a school. They could have a personalized parent letter inserted in each one. And if they wanted to do that, of course, there was a charge for it. They could put that against their 8000.

Then on the other - - and there are other things as well. Then on the other side, any C prize money was credited to that account to bring it down.[6]

He believed the representatives were given monthly statements documenting his or her 8000 account balance. Representatives were permitted to question charges on the account, and GAO rectified erroneous charges. He claimed that Employee was charged with 8000 account expenses even during his first two years of employment. While charged, the expenses were "written off" for Employee's first two years of employment.

Mr. Ring stated that an employee's 8000 account balance was carried forward to the next fiscal year if not reconciled. He noted that GAO often made a "business judgment" based upon a particular representative's profitability in determining whether the amount could be carried forward or whether payment should be due in full. He recalled that Thomas Belli, who was President of GAO, and Kevin Hawley, who was Vice President of Sales, worked with representatives to reconcile his or her 8000 account balance. Employee even provided a check in partial payment of his 8000 account balance in June 2008. Employee did not indicate the money was not owed or that he was paying the amount under protest.

Mr. Ring stated that Employee was required to submit program agreements, defined as the school's agreement with the representative to run the fundraising program through GAO. These agreements were essential and necessary for GAO to determine the resources and staff needed to support the sales season and to determine a representative's advances against commission. There were two selling seasons for each school year, namely Fall and Spring. He estimated that approximately 80 percent of a representative's business was completed in the Fall, with the rest occurring in the Spring. Accordingly,

---

[6] The C-prize program was a cash incentive program that allowed the sales representative to credit his or her 8000 account in lieu of using the prize program provided by GAO. Employees could also receive cash if his or her 8000 account was current.

representatives were encouraged to "work a season ahead." He explained that schools would sign program agreements with other companies if the representative failed to secure agreements in a timely manner. He noted that Employee worked to re-sign his Fall business in the months of January, February, and March.

Relative to Ms. Laise, Mr. Ring claimed that she played an administrative role after the initial recruitment process was completed. He denied ever hearing anyone refer to her using a formal title. He acknowledged that he held the formal title of Executive Vice President but claimed that he did not acquire said title until GAO purchased QSP, Canada. He agreed that Ms. Laise received a salary of approximately $150,000 per year in 2002 and that her pay increased to $165,000 per year in 2007 and to $173,250 in 2008. She also participated in the stock program, beginning in 2008. He further agreed that her direct supervisor was listed as Henry Bedford, the Chief Operating Officer at the time who later became the Chief Executive Officer. He noted that himself and the other members of the initial "magazine team" also reported to Mr. Bedford. He agreed that Mr. Bedford identified Ms. Laise as a manager in an email, dated August 18, 2005. He later asserted that he and others were given the title of Vice President for insurance purposes because GAO provided an accidental death benefit based upon the level of his or other position in the company. He surmised that Ms. Laise's title was likely given in accordance with the benefits package. He acknowledged that she was also a former executive for QSP and that she was involved in the negotiations with GAO to hire QSP's former senior management team.

Mr. Ring admitted that it was "possible" that Employee could have had calls or meetings with Ms. Laise concerning his compensation. He stated,

> He could have because, as I testified earlier, she was mandated to get information from the candidates, their W-2s, their sales, and those kind of things, so that we could put together a compensation plan. But that would happen only after we had the full day together and determined if we wanted to go forward. We didn't need to do that in advance of the meeting. But then she should. I'm sure she would.

He denied ever advising anyone that he or she would never be responsible for 8000 account expenses or an overdraw on the commission account or that his or her salary would never decrease. As lead of the recruitment team, he never made such a promise to any of the 50 people he hired. He acknowledged that he had not confirmed the absence of such representations with Ms. Laise prior to deposition or trial because she no longer worked for GAO.

Carol Costa testified that she has been employed by GAO as a compensation manager for approximately 27 years. She reports to Timothy Underwood and manages a staff of four people. She is "in charge of all of the pay for the salespeople and the payroll for the administrative staff." Her office also mails the 8000 account statements, which are printed through the Great American Sales Information ("GASI") website. The customer service department, headed by Tracy Armstrong, is responsible for drafting the 8000 account statements, while her department is responsible for drafting the commission account statements. The 8000 account and commission account statements are mailed on a monthly basis.

Ms. Costa testified that she is also responsible for administering the "part-timer program." She explained that some sales representatives were qualified to receive an assistance allowance to pay someone to work for them. Assistants are paid by GAO in accordance with an hourly rate as documented by the individual sales representative. She stated that Employee received an assistance allowance of $6,000 for the 2009/2010 fiscal year. She noted that in Spring 2011, Employee continued to submit time cards for his spouse who served as an assistant even though he had exhausted his allowance for the year. Employee normally used his assistant hours in the Fall because most business occurred in the Fall. She questioned Employee, who claimed that his wife was already working on things needed for the Fall season. His request was ultimately approved.

Ms. Costa identified the Employment Agreement at issue and explained that Employee received a two-year guaranteed salary and that he was not responsible for the balance on his commission and 8000 accounts. She acknowledged that the 8000 account arrangement was never evidenced in writing. She provided that after the initial two-year term, he was paid in accordance with the yearly Pay Plans sent by her office.[7] She confirmed that Employee never received another Notification of Pay Plan and that the yearly Pay Plans were not wholly applicable to him because he received a guaranteed salary and a car allowance program, among other things, as employment incentives. She recalled that the yearly Pay Plans were revised for the 2008/2009 fiscal year to reflect a salary component for all representatives.

Ms. Costa stated that Employee never indicated that the yearly Pay Plans did not apply to him, that he was not paid in accordance with his agreement, or that he was not responsible for the balances reflected on his statements. She explained that representatives were permitted to object to items listed on the 8000 account within 60 days of receipt of the statement and that any objections to the balance on the commission account should be made within 10 days of receipt of the statement.

---

[7] She agreed that the yearly Pay Plans were not sent via certified mail and that the representatives were not required to sign the plans, indicating assent to the terms.

Ms. Costa testified that representatives, including Employee, worked with his or her manager to calculate commission draws in accordance with a "12-pay" system, meaning that their projected earnings were divided into 12 equal payments and paid on a monthly basis each year. She explained,

> A 12-pay is a worksheet that the manager works up with the [representative], which it begins with what contracts they have in-house for the upcoming fiscal year. And they equate that into sales and then apply that to the commission rates and say – which tells a [representative] they're going to earn so much for the next 12 months, and that money can be divided . . . from that amount into the upcoming 12 months.

Representatives were permitted to purchase prizes at the national meeting each year through the bulk buy program, where items selected by the representatives were charged to the 8000 account but reconciled through the 12-pay system. She explained,

> When we're doing the 12-pay, there is a section of money before it is spread that goes against the bulk buy, whatever their bulk buy payment was, or if they want to take a certain amount of money up front, that is taken off of the 12-pay first and then the remaining amount is spread.

Representatives could requests advances for cash prizes, which are deducted from the 12-pay before the remainder of the projected balance is spread into 12 equal payments.

Ms. Costa identified one of Employee's 12-pay worksheets, which reflected that he was entitled to an annual draw of $105,000, less a bulk buy payment of $7,782 and total cash advances of $16,000, leaving him with 12 equal monthly payments of $6,768 for the 2010/2011 fiscal year. She believed the bulk buy payment and cash advances evidenced his payment of fundraising expenses. His cash advances were not taxed in accordance with the accountable expense program. She explained,

> [The accountable expense program is] an approved program through the [Internal Revenue Service ("IRS")] where we can allow our sales representatives to take nontaxed money during the year, and then they are responsible – they have to turn their receipts in to us. It's their responsibility to turn their receipts in to [GAO], and then we'll offset the nontaxed income with the amount of receipts they've turned in.

She provided that if Employee only provided $10,000 in receipts, then GAO would have converted the remaining $6,000 into income and documented that amount on his W-2.

Ms. Costa acknowledged that Employee was not responsible for the cost of fundraising for his first two years of employment with GAO. In 2004, he received an advance of $50,000 for his fundraising efforts, while his bulk buy payment was $5,500. She provided that these amounts were covered by GAO. Beginning in 2005, money earned through the C-Prize program was applied internally to his 8000 account balance and documented as payroll deductions. Employee's commission draw was also reduced on a number of occasions, beginning in July 2006. She stated that his commission draw was reduced again by $2,000 per month in February 2009 and by an additional $200 per month in August 2009 and that two additional reductions occurred in February 2010 and January 2011. She provided that Employee did not object to these reductions.

Relative to Ms. Laise, Ms. Costa confirmed that internal titles were sometimes assigned for purposes of the life insurance program. She identified an internal document that classified Ms. Laise as a vice president for insurance purposes. She identified a different document that provided for Ms. Laise's classification as a manager. She explained that Ms. Laise did administrative work similar to her role. She admitted that her salary was much less than $150,000 in 2002 and agreed that a $150,000 salary was "more of an executive-type salary."

Tracy Armstrong testified that she has been employed by GAO as the director of customer care for approximately 16 years. Her department is responsible for all customer communications. She explained that GAO's customers consist of its representatives, those working with representatives to coordinate a fundraising program, and consumers of products sold through the fundraising programs. Her department is also responsible for administering the 8000 accounts. She stated,

> The 8000 account is an account for a sales representative. When they are hired with the company, we set them up an account that allows them to place orders and track their business through the system.

She explained that representatives purchase prizes and bulk buy items through the 8000 account. Her department is responsible for training representatives on the use of the 8000 account and the GASI website. Her office also fields questions from representatives concerning his or her account. She provided that representatives are also directed to review the business management guide available through the GASI website. The guide addresses the use of the 8000 account. She confirmed that the business management guide contains a provision providing for the acceptance of changes on the 8000 account if not rejected within 60 days of the invoice date. She claimed that Employee never objected to charges placed on his 8000 account.

Ms. Armstrong confirmed that Employee was not responsible for his 8000 account balance for his first two years of employment. She identified one payment on his 8000 account in the amount of $14,000 in June 2008. She provided that his current balance was $248,093.22, which included the transfer of his commission account balance.

Shannon Coley testified that he provided part-time assistance for Employee, beginning in 2002. He continued in the same part-time position when Employee left QSP to start the magazine division at GAO. He was later hired by GAO as a sales representative in September 2005. Unlike Employee, his employment agreement specifically provided that he *was* responsible for any overdraw on his commission account that occurred in his second year of employment.[8] His agreement also provided that his pay would be determined in accordance with the Pay Plans following the expiration of an initial two-year term. He acknowledged receipt of an invoice documenting charges on his 8000 account at some point in 2005 and agreed that money he earned through the C-Prize program was applied to his account balance.

Mr. Coley testified that he resigned on June 16, 2011. He provided that at the time of his resignation, his earned commissions were not commensurate with his draw in advance of commissions. He believed that his salary would continue to decrease if he remained with GAO because of a new policy providing that his pay would be based upon his sale of magazine subscriptions. He explained that he sold mostly cookie dough and gift items in his territory because those in his territory could not afford to purchase the magazine subscriptions. He was also discouraged by GAO's new business practices, namely representatives were encouraged to violate Georgia law and bypass the school's main office to speak directly with the teachers without obtaining a visitor's pass. Further, GAO implemented tier pricing and advised its representatives to advertise that schools could make a 50 percent profit when most of the products offered did not garner that amount of profit. He discussed his concerns with his manager, Chris Plummer, and advised him that he could not maintain his position at the current pay level. He then declined Mr. Plummer's offer of an advance against commissions because he did not want to increase his debt with GAO.

He agreed that in March 2011, he and Mr. Patterson discussed his resignation and a plan to work together servicing the same territory in March 2011. He identified an email, dated April 14, 2011, in which Employee provided a QSP representative information about the territories serviced by them. The email, addressed to Myers Parsons with QSP, provided as follows:

---

[8] Mr. Coley also signed a promissory note upon his resignation in which he agreed to remit payment for the balance of his 8000 account.

Here are the numbers based on total gross dollars for Brad Patterson and Shannon Coley:

> Magazines: 517,000
> Gift: 225,000
> Cookie Dough: 301,000
> Candy: 309,000
> Discount Cards: 14,000
>
> Total Business: 1,366,000 + Gross Business

Just let me know if you need anything else. We would like to start effective June 1st 2011. I look forward to hearing from you.

Mr. Coley acknowledged that despite his intent to resign from GAO, he submitted his sales projections on May 10, 2011, in which he predicted $145,000 in sales for the Fall 2011 season. He admitted that GAO likely ordered brochures and products based upon his sales projections submitted in May 2011. He explained that he had not yet committed to Mr. Parsons concerning his possible employment with QSP at that time. He then identified an email, dated May 16, 2011, in which he discussed his signing of a QSP distributor agreement with Micah Dowling, a QSP employee. He confirmed his intent to resign from GAO and join QSP with Ms. Dowling on May 27 by stating, "I'm all in." He had also confirmed his plan with Employee at some point in May 2011.

Mr. Coley admitted that he may have advised two clients of his possible plan to leave GAO prior to his resignation. However, he claimed that he did not sign customers for himself prior to his resignation and that he did not advise his customers to wait for him to start his fundraising business. He identified an email, dated June 21, 2011, at 9:09 a.m. in which he advised his clients as follows:

> I wanted to let you know some exciting news. I now have a new line up of fundraising products. I saw a need to make some changes in product brands in order to offer new options and improve things for my schools. There is no changes in service or how I do fundraising programs. The only thing that has changed is the brand names. Nothing has changed on how the fall or spring fundraiser will work. I will get the new information to you as soon as possible. Give me a call or send me an email when you get a chance or have some questions. This is my new email and my phone number is the same.

He claimed that GAO also attempted to solicit his clients and that he competed against the representative hired in his stead.

Mr. Coley testified that he produced 26 program agreements for the Fall 2010 season but that he only produced a few agreements for 2011. He admitted that he did not use his best efforts to generate business for the 2011 season and that he stopped selling for GAO at some point in 2011, despite the fact that he collected a paycheck from GAO through June 30, 2011. He further admitted that he and Employee submitted program agreements to QSP on June 21, 2011. He also organized Treasure Leaf, a limited liability company, in June 2011 to combine his business with Employee and to receive payments from QSP. They used the Treasure Leaf account from Summer 2011 through 2012. He received two wire transfers, totaling $63,700, from QSP that were deposited into his personal bank account. He wrote two checks, totaling $55,950, to Employee and withdrew cash for himself but never transferred any of the funds to Treasure Leaf. He admitted that these funds were also not reported on his tax return. He claimed that it was not his intent to conceal the funds.

Robert Wayne Holder testified that he worked for GAO from 1990 through 2005. He stated that he did not leave with a balance on his 8000 or commission accounts. He explained that he simply "kept [his] draw low enough" to ensure that his bonus covered any balance. He recently returned to GAO to work as a sales representative in the territory formerly occupied by Employee and Mr. Coley in 2011.

Mr. Holder testified that he, along with other representatives, routinely completed program agreements after the national sales meeting in February. He stated that program agreements are not binding contracts even though such agreements are relied upon in the regular course of business as a forecasting measure to set the calendar for the season. He provided that upon his return to GAO, he was provided with "the book of business that [Employee and Mr. Coley] worked with the previous year." He explained that the "book of business" contained client information for his territory, which included some of his prior clients from his first term of employment with GAO. He expected that some program agreements would be in place because he was hired in June; however, he soon discovered that neither Employee nor Mr. Coley had secured many program agreements prior to his hiring. One program agreement submitted by Employee was for a school that no longer existed and had not been operational for approximately four years. When he attempted to contact those who actually signed with GAO the previous season, he discovered that most had already signed agreements with other companies. He was only able to retain approximately 15 percent of the schools previously serviced by GAO in addition to his 20 or 30 clients he brought GAO from his independent fundraising business he operated prior to his hiring in 2011.

Kevin Hawley testified that he is currently employed as the Vice President of Sales for GAO. He stated that he worked as a sales representative from 1981 through 2000 and that he received his title of Vice President of Sales in 1998. He is responsible for, inter alia, hiring and training new sales representatives. He stated that GAO began developing the magazine division in 2002 and implemented the program in 2003. He stated that GAO hired several QSP employees to develop the division and train their sales representatives how to sell magazines. He provided that those coming from QSP to develop the magazine division were paid on the same compensation schedule as existing employees for all products but magazines. Such representatives received a higher commission rate of 25 percent for magazine sales and were also provided a car allowance through the Runzheimer program. Such representatives also received a guaranteed income and were not responsible for balances on the 8000 and commission accounts for his or her first two years of employment. He stated that representatives who accrued balances on the accounts beyond the first two years of employment were expected to reconcile the accounts at the end of each fiscal year on June 30. He agreed that some were allowed to accumulate a balance beyond the June 30 date.

Mr. Hawley explained,

I think we probably assumed, or they assumed, that they would actually get back all of their customers that first year back in the territory. In many cases that didn't happen. And, so, [Thomas Belli], felt like, knowing these people from his previous years at QSP, that these people would grow their sales, build back their business and, basically, right their commission accounts and 8000 accounts.

Despite this belief, the representatives remained responsible for the balances on his or her account. GAO eventually developed an overdraw reduction plan to assist representatives in reconciling their balances. Employee was offered the plan and agreed to participate.

Mr. Hawley testified that Employee submitted a sales forecast for the Fall 2011 season and had communicated that he was "on board," "engaged," and expected a growth in sales for the following Fall. He provided that Mr. Coley also projected a growth in sales for the Fall 2011 season. Employee even participated in the part-time allowance program and submitted time sheets for his wife, who allegedly assisted him in preparing for the Fall 2011 season. He conceded that he was without evidence to establish that Employee knew of his impending resignation at the time he submitted the sales forecast and the request for approval of his wife's time sheets. He telephoned Mr. Holder within 24 hours of Employee's resignation in an attempt to secure the sales territory for the upcoming season. He identified a letter, dated August 16, 2011, sent to clients in the

territory informing them of the change in representatives and asking them for their continued business.

Employee testified that he began working for QSP in 1989, following his graduation from college. He began by assisting his father, who was in a management position at the time. Two years later, he was hired by QSP as a sales representative. He continued to work with his father but also serviced his own accounts. He then received his father's accounts when his father retired in 1992. He has continued to maintain a number of the same accounts since that time.

Employee testified that he, along with Mr. Brigman, then pursued employment with GAO in 2003. He traveled to Nashville, Tennessee, where he met with a number of people, including Mr. Ring and Ms. Laise. He could not recall Ms. Laise's title but claimed that she was a "major recruiter" and stated that she worked previously in the finance division at QSP. He provided that he was invited to interview for a positon in the newly-formed magazine division. He stated,

> [M]agazines, in the fund-raising business, are the most profitable because there is no product involved, there is no inventory, no delivery as far as trucks and things like that. You don't have to have warehouses and things like that. So when orders come in, you just basically fulfill the orders electronically, and the magazine companies, the publishers, they send the magazines to the customer. So it's very profitable for the company.

He stated that magazine sales required specialized knowledge and experience different from that required for cookie dough or gift sales. He had amassed approximately 14 years of experience in magazine sales prior to his hiring at GAO. He was also in the top 12 out of 400 representatives in terms of sales production at the time.

Employee recalled that Mr. Ring and Ms. Laise advised him that they intended to hire people with experience who could bring established accounts but also train GAO's existing representatives. He also met with Mr. McDowell, who discussed the stock program and advised him that he could be a millionaire if he brought his accounts to GAO. He was not advised that GAO would not redeem his stock if he left the company, that GAO could suspend his stock account, or that GAO could retain the money paid by him into the program if it did not repurchase his stock. He claimed that that he would have never participated in the program had he been so advised.

Employee testified that he met with Mr. Ring and Ms. Laise a week later to discuss further his potential for employment. He was advised to bring his W-2 and told that they would discuss the specifics of his potential income. He noted that Mr. Ring left

after approximately 20 minutes and that he continued the discussion with Ms. Laise, who advised him that his pay would be based on his W-2 from QSP. He noted that his W-2 at that time reflected an income of approximately $162,500. He recalled that she advised him that his current income of $162,500 would be guaranteed for his first two years of employment. He stated that he questioned his income level following the initial two-year period because his sales figures at the time included a large account that represented approximately $50,000 of his income. He explained that he was concerned that his income would decrease if he was unable to secure the account upon his hiring.[9] He claimed that Ms. Laise advised him that his income would remain at $162,500 as long as he continued to train the existing representatives. She also advised him that he would not be responsible for charges on his 8000 account as long as he was assisting in the training and development of the magazine division.

Employee testified that Ms. Laise called him after the meeting and advised him that an offer would be forthcoming. Thereafter, he received a contract for employment in the mail. He signed the contract and returned it through the mail. He acknowledged that he was instructed by GAO to comply with his covenant not to compete with QSP and that he was placed in a different territory than what he previously serviced for QSP for his first year of employment with GAO. His contract with GAO required him to use his best efforts in generating sales for GAO and to adhere to duties of loyalty and good faith that included the following provision:

> [GAO] asserts and [Employee] hereby acknowledges and agrees if [Employee] competes or prepares to compete directly or indirectly against [GAO] or any of its affiliates during the course of the agreement, or fails to dedicate his or her best efforts and full time to performing for [GAO] in accordance herewith because he/she is starting a new business or helping another start up or operate another business during the course of this agreement, then [Employee] will be liable to [GAO] for breach of loyalty in any instance.

His employment agreement specifically provided that he was entitled to $162,500 per year for his first two years of employment. The agreement also specifically provided that he would not be responsible for any overdraw on the commission account and did not reflect that he would be held responsible for charges on the 8000 account. The agreement further provided that he was entitled to a 25 percent commission on magazine sales. His salary for his third year of employment was not specifically encompassed in the contract. He stated that he never executed another document concerning his income with GAO.

---

[9] He was unable to retain the account. The loss of the account was detrimental.

Employee stated that he did not work in his prior territory for his first year of employment with GAO. Instead, he trained others and attended meetings held to develop the magazine division. He provided that another representative was assigned to his territory in an effort to solicit his prior clients on his behalf because he was prohibited from doing so in accordance with his non-compete agreement with QSP. He returned to his territory during his second year of employment but also continued to train others. He asserted that he was successful in retaining his clients and was even offered an opportunity to participate in the stock program in 2004 and 2006. He halted his participation in 2010 after his pay had been reduced and he could no longer afford to participate. He claimed that he never received a private offering memorandum from Southwestern for either the 2004 plan or the 2006 plan. He asserted that a disclosure was not provided informing him that his stock would not be repurchased unless he agreed to offset the value of the stock by the balances held on his 8000 account and commission account. He stated that his stock had not been repurchased at the time of trial. He claimed that he invested $38,532 in stock that was now allegedly worth approximately $106,000, according to GAO.

Employee agreed that he received 12-pay worksheets generated by Mr. Ring but denied ever participating in the generation of the document. He believed that he was entitled to a guaranteed draw of $162,500 per the terms of his contract but that he was advised that he was only eligible to receive a draw of $105,000 for the 2010/2011 fiscal year. He agreed that he determined how he received the $105,000, namely whether he would receive an advance and whether he would utilize the bulk buy program. He voiced his concern and objection to his pay with Mr. Ring but later acquiesced to the application of a portion of his draw to the 8000 account through the 12-pay system and the bulk buy program. He explained that while he was not liable for the balance on his 8000 account, he was liable for the purchase of his promotion prizes each year through the bulk buy program. The following colloquy then occurred:

Q.     Maybe I didn't ask a good question or maybe you didn't understand it. Let's look at the 12-pay again.

A.     I didn't consider it paying on my 8000 account.

Q.     Well, I understand you're now saying you didn't consider it, but let's talk about what actually happened. You bought the bulk buy and it was placed on your 8000 account; correct?

A.     Correct.

- 20 -

Q.      And then it was taken out of your draw, as shown on the 12-pay, and it was then applied to the 8000 account balance to pay for the bulk buy. That's how it worked; isn't it?

A.      Yes.

Employee testified that he sold products other than magazines, including cookie dough, gifts, candy, and discount cards.  He agreed that the commission for these items was detailed in the yearly Pay Plans.  He denied ever receiving a Pay Plan in the mail but agreed that he viewed them at the national meetings each year.  He explained that the Pay Plans submitted by GAO in litigation were inapplicable to him and others hired from QSP to start the magazine division.  He stated that those operating under the Pay Plans submitted at trial were not entitled to a salary component or the Runzheimer car expense program.  Further, the Pay Plans listed an 18 percent commission on magazine sales, as opposed to the 25 percent commission he received.  He explained that the 25 percent commission was significant because approximately 70 percent of his business was comprised of magazine sales.  He claimed that GAO provided "Parallel Pay Plans," one for those coming from QSP and another for the existing GAO representatives.

Employee acknowledged that he began receiving 8000 account statements following his first two years of employment with GAO.  He contacted Ms. Laise, who explained that the statements were used to keep track of his brochure use and other items but reassured him that he was not responsible for the charges.  He contacted her again when he continued to receive the invoices.  She continued to reassure him on more than one occasion and advised him not to worry about the statements.  He later remitted payment on his 8000 account in the amount of $14,000 on June 1, 2008.  He explained,

> [Mr. Ring] contacted me [in May 2008] and said you have 30 days to make a $20,000 payment on your 8000 account.
>
> And I immediately questioned him and said, "What are you talking about? Have you talked to [Ms. Laise] about this?"
>
> Because I have asked – I have been getting statements with the 8000 account [following his first two years of employment].  That was not what [Ms. Laise] told me.  And, so, I questioned that very grievously.  I was upset.
>
> [Mr. Ring] basically said, well, I have been asked to call you and tell you to make a payment on your 8000 account of $20,000 and you've got to do it by June 1st.  And, so, I scraped everything up I could.  He said that my job

depended on it after I discussed it with him. He was not upset. I was very upset . . . .

* * *

But he told me he was asked to do that. Basically telling me, look, I'm not asking for this, somebody else is. And he was asking for $20,000 in 30 days. And I scraped up as much as I could. I actually – it was not easy to . . . try to come up with $20,000.

He agreed that the funds were applied to his 8000 account balance at his direction. He further agreed that he did not indicate in writing that his payment was made under protest but claimed that he verbalized his disagreement. He acknowledged that money earned through the C-prize program was also applied to his 8000 account balance. He explained that the transfers were made internally without his involvement.

Employee testified that following his first two years of employment, he paid for his own fundraising expenses and that he was not reimbursed for approximately $65,000 in fundraising expenses in 2005. However, he claimed the expenses as a deduction on his tax return. He further agreed that he had not received $162,500 from GAO since 2005. He believed his reduction in pay was in violation of his Employment Agreement. He discussed the issue with Ms. Laise and had "many discussions" with her thereafter. She advised him that it would "get better." He stated,

I didn't have anywhere to go. I mean, what – I mean, I was making great money, but it wasn't the money that I signed my contract with, and what I understood I was supposed to be making. And many discussions were made about that with her, because [Ms. Laise] is the only person that we discussed financials with. And she also told us not to share that with anyone else [at GAO], because . . . other people . . . were not getting what we were getting, and we were told to keep that quiet. And the only discussions I ever had, as far as finances, were with [Ms. Laise], other than [Mr. Ring] sending an e-mail about a 12-pay, with no discussion.

He later signed the plan crafted by Mr. Belli to reduce his 8000 account balance.

Employee testified that he and Mr. Coley first discussed their plan to leave GAO in March 2011. He began speaking to Myers Parsons, a QSP representative, in April 2011. He provided Mr. Parsons with a list of his clients and an estimate of his sales on April 14. He claimed that he had not made his final decision to resign until sometime in May. Thereafter, he signed an independent distributor agreement with QSP on May 18,

eight days after he submitted his projected sales forecast for GAO.[10] He also requested 50 program agreements from Ms. Dowling on June 9, a week prior to his resignation. He explained that he knew GAO would attempt to secure his accounts immediately upon his resignation and that it would become a very competitive environment.

Employee acknowledged that the effective date of his QSP agreement predated his resignation with GAO by one day. He claimed that from February 2003 through June 16, he never engaged in school fundraising business for any company other than GAO. He insisted that he used his best efforts to solicit sales while still employed by GAO. He later acknowledged that he only submitted 6 program agreements for GAO in 2011 but that he submitted 12 program agreements for QSP four days following his resignation.[11]

Employee agreed that he contacted clients within an hour of his resignation from GAO, informed them that he was an independent contract, and requested their business. The email he sent to his clients provided, in pertinent part, as follows:

> I just wanted to confirm our start date of []. I will get with you all well before then to get everything ready. I am excited to tell you that I am an independent contractor now which will not change the way we have done our sale but it will mean I will have more programs and benefits to offer! I look forward to working with you on our sale again this year. Would you mind confirming our date by a reply email and I will be in touch soon. You can use this email from now on as my contact or call me anytime.

He insisted that he did not meet with clients prior to contacting them by email. He claimed that Mr. Holder immediately contacted his clients and that he and Mr. Holder were even in the same schools attempting to secure agreements on the same day. He was able to maintain some agreements because he had served in the schools and formed relationships.

Employee testified that that upon his resignation, he formed Cloverleaf Fundraising, LLC; however, he worked as an independent contractor for QSP through Treasure Leaf, the LLC owned and operated by Mr. Coley, for his first year of employment. He agreed that QSP paid Mr. Coley directly instead of through Treasure Leaf and that money received from QSP was not deposited into Treasure Leaf's account. He initially requested payment through Cloverleaf, his LLC; however, Mr. Parsons refused, citing the possibility of a lawsuit with GAO. He claimed that he did not conceal

---

[10] He claimed that he had not made his decision to resign at the time he submitted his yearly sales forecast.

[11] He submitted 42 program agreements for GAO in 2010.

his income but agreed that his wife had no knowledge of at least one $46,000 payment from QSP that was not included on his tax return. He simply neglected to include the $46,000 payment because he never received a tax form documenting the same. He acknowledged that it was his responsibility to prepare a 1099 form as the tax managing member of Treasure Leaf. He also failed to report approximately $40,000 he received from Treasure Leaf in 2012.

Relative to his counter-complaint, Employee asserted that he requested reimbursement for payments made to his 8000 account and for any salary reductions made in violation of his Employment Agreement. He requested the return of his investment in the stock program, including his initial investment and the current value of the stock. He agreed that he received some documentation related to his participation in the 2004 and 2006 stock plans. He completed stock election forms and was provided with question and answer forms that provided, in pertinent part, as follows:

> Should your employment be terminated for any reason, including death or disability, the Company has the option to buy from you or your estate any shares you have purchased at the current Fair Value. Should you desire to sell your shares while still employed, the Company retains first right of refusal. The Company may purchase the stock at the lesser of the Fair Value per share or the price per share for which you offer to sell the shares to another party.

However, he denied receipt of the private offering memorandums, despite his execution of a document indicating his receipt of the same. He acknowledged that he received a disbursement check in the amount of $8,692.05 from Southwestern during the pendency of this litigation.

Employee's wife, Angela Patterson, testified that she assisted Employee in his fundraising efforts for GAO. She was paid as a part-time assistant approximately $5,800 in 2010 and $6,000 in 2011. Employee completed her timesheets and submitted them on her behalf.[12] She provided that in 2011, her assistance was limited to his Spring contracts. She did not assist Employee in his fundraising efforts for Fall 2011.

Mrs. Patterson claimed that she assisted Employee by organizing his fundraising materials, delivering items to the schools, retrieving items from the schools, drafting letters and promotional flyers, and inputting information into the computer program for each fundraiser. She also assisted him with various promotions at the schools by setting

---

[12] Employee claimed that the time sheets were an accurate reflection of the hours worked. He explained that they worked hard to meet certain sales goals for GAO in Spring 2011.

up and tearing down displays. She noted that she was not paid for her assistance from 2004 through 2009. She agreed that she did not travel "as much" following her employment with FSG Bank in March 2011 but stated that she continued to assist him in his fundraising efforts.[13] She claimed that it was possible that she even worked more than what was reflected in the time sheets. She and Employee worked on the weekends to complete the time-consuming tasks necessary to sustain his business for GAO. She claimed that he also did not set up accounts or complete other tasks for QSP while employed by GAO. She stated that Employee first expressed his intent to resign from GAO in May 2011.

Timothy Underwood, GAO's Chief Financial Officer ("CFO"), testified that he has held that position for approximately ten years. He provided that if Employee breached his duty of loyalty, Employee would be liable for $15,000 in unearned compensation he received in Spring 2011. He also testified extensively concerning GAO's estimated lost profits during that time period as a result of Employee's breach of his duty of loyalty. Using three different methodologies, he estimated that GAO lost somewhere between $63,000 and $106,000 as a result of Employee and Mr. Coley's resignation. He agreed that his calculations did not account for the business Mr. Holder brought to GAO upon his hiring.

Kevin Hickman testified extensively concerning his education and professional work experience as an accountant. He founded his own accounting firm, Hickman & Associates, PC, in 1992 and has worked there since that time. He has seven employees and occupies an office in the Southwestern/GAO building. He explained that Southwestern is a client and is charged an hourly rate based upon work performed.

As pertinent to this appeal, Mr. Hickman reviewed the tax returns for Treasure Leaf, Clover Leaf, and the individual tax returns submitted on behalf of Employee and Mr. Coley. He also reviewed bank statements, banking records, canceled checks, expense reports, expense report summaries, and deposit records as provided by GAO. He provided that Employee utilized both Form 2106, a form used to report employee expense less any reimbursements, and Schedule C, a form used to report a net profit and loss from a proprietorship. He believed that Employee was "moonlighting" or holding a second job while still employed by GAO based upon his use of the two forms in 2006, 2007, 2008, and 2009. He stated that Employee reported no 2106 expenses in 2009, 2010, or 2011 and that his records reflected that Employee simply deducted those expenses on his Schedule C form, which was favorable to him but not a proper accounting practice.

---

[13] Employee conceded that he submitted timecards indicating that Mrs. Patterson was traveling on his behalf during that time period.

Mr. Hickman stated that Employee's net income was $126,000 in 2005; $114,000 in 2006; $94,000 in 2007; and $77,000 in 2008. He provided that Employee was not paid $162,500 or more since 2005. He further claimed that Employee failed to accurately report his income in 2011 and 2012.

Thomas McDowell, III, testified that he has been employed by GAO since 1971. He became the first president of the company in 1975 and served in that capacity until his retirement in 2007. He recalled meeting with those recruited by GAO to start the magazine division. His intent was to "spend time with them" and to "get to know them" and "their dreams and goals." He was also responsible for educating the prospective representatives regarding the wealth accumulation opportunities provided if hired by GAO. He explained that GAO is a wholly owned subsidiary of Southwestern, which issued the stock program. He stated that participation in the stock program was dependent upon each representative's continued sales performance. He advised prospective representatives of the particulars of the stock program, including the requirements for participation and the possibility of receiving dividends. He also advised prospective representatives of the possible value of his or her investment but did not guarantee any results. He noted that he has advised representatives of the board's practice of refusing to redeem stock for those who resign and then compete with the company. He provided that it was Cindy Johnstone's responsibility to then identify who was eligible for participation and to guide them through the process of participation.

Ms. Johnstone testified that has been employed by Southwestern for approximately 23 years. She recalled that she first served as a financial analyst but has since attained the positions of Vice President, Secretary, and Treasurer of both Southwestern *and* Great American. She has served in her current capacity for approximately nine years. She also serves as Vice President, Secretary, and Treasurer of all subsidiaries that are incorporated separately and has general financial oversight of Southwestern and the other subsidiaries. She provided that Southwestern owns the stock program that has approximately 400 participants. She recalled that the board of directors adopted the program in 1990 and that Southwestern employs legal counsel to ensure compliance with laws relating to the issuance of securities and to prepare the stock-related documents.

Ms. Johnstone testified that she is responsible for determining who may or may not be eligible for participation in the Southwestern stock plan in accordance with his or her level of sales or profits for GAO. She then requires each eligible employee to complete an election form or provide some type of written authorization. She stated that employees are then provided with a private offering memorandum, a copy of the stock option plan as well as an option agreement, and a subscription agreement. She noted that representatives and the company sign the stock option plan and the subscription

agreement. She identified the subscription agreement, which provided, in pertinent part, as follows:

> The subscriber understands and intends that the company and its counsel will rely upon the representations made by him in this Agreement and related documents and they are fully entitled to rely upon each and all of the same without further inquiry. He further agrees to save and hold the company and its counsel harmless by any loss or expense incurred by any of them by reason of their reliance thereupon.

She provided that Employee indicated his receipt of the documents and his understanding of the stock option plan by signing the document. She stated that her records further indicated that Employee was issued a private offering memorandum, identified as Number 53, for the 2006 stock program. She stated that Employee's stock account had since been suspended as a result of the litigation. Despite this fact, Employee received payment of a dividend check with interest in August 2014. She provided that his investment was currently valued at approximately $99,000. She agreed that Employee would have to find a willing buyer if Southwestern refused to repurchase the stock and that there were certain limitations to securing a buyer.

Ms. Johnstone stated that if Southwestern approved the request for redemption, it would provide a promissory note, payable over a five-year period, instead of immediate payment. She noted that once redemption was approved, any payment was subject to a reconciliation process in which Southwestern offset the value of former employees' stock by amounts owed on the commission and 8000 accounts as indicated by GAO. She provided that if an employee objects to the calculation, she refers them to Ms. Costa to discuss the issue.

Mr. Belli testified by deposition that he began working for QSP in 1977. He took a three-year hiatus and worked for Reader's Digest, QSP's parent company, for two years before returning in 1982. He served as a group product manager for various product lines and became Chief Operating Officer ("COO") in 1984. As COO, he oversaw marketing product development and coordinated with the sales management. He was promoted to President in 1986. As President, he oversaw marketing sales, operations, and public relations and was responsible for the financial health of the company.

Mr. Belli testified that he was asked to resign his position at QSP in February 2000.[14] He remained unemployed until he was hired as Chief Executive Officer[15] of

---

[14] He resigned from QSP in 1995 to pursue other interests before returning in 1998.

[15] He filled the role of President once Mr. McDowell retired.

GAO in 2005. He received salary, expenses, and 70,000 shares of stock as part of his agreement. GAO was housed in the same building as Southwestern, thereby providing a different business culture than what he experienced at QSP. He explained that the "organizational structure was kind of fluid" and that managers might "jump a couple levels and talk to someone above their manager more frequently than at QSP."

Mr. Belli stated that he was specifically hired to assist in the development of the magazine division. Approximately 11 different types of magazine programs were in the beginning stages of development at the time of his hire. He believed the training of the representatives was an important aspect of the viability of such programs because the programs "should run with a school every year, not occasionally or on a hit-and-miss basis." He explained that "reorienting salespeople who had sold other product lines" was not easy because the "tendency [is to] run a program – move on and run another program at another school, whereas with magazines, it's . . . more service oriented[.]" He provided that those hired to develop the program at GAO

> were primarily responsible for training the other several hundred representatives who [GAO] had employed prior to their arrival.

> That process just involved those experienced representatives riding with the [GAO] veterans and teaching them school by school how the magazine program worked over the course of the time they were together.

Mr. Belli testified that he was responsible for the budget in terms of reviewing and developing compensation programs for the representatives. He acknowledged that GAO maintained "parallel" compensation programs for those he termed GAO veterans and those coming from QSP. He tried to build and ultimately integrate the different systems, and he also worked to develop an incentive program to reduce the 8000 and overdraw accounts. He described the 8000 account as a "catch-all" for expenses, including promotional items ordered through the company. He noted that the 8000 account was a "point of contention" for representatives because "it wasn't always clear what was in the 8000 account." He recalled that "quite a few" representatives spoke with him and expressed concern about his or her 8000 account. He agreed that the accounts were not settled at the end of each year and explained,

> We knew that they had relationships with schools, and that eventually, they would – their commissions would rise to the level that they needed or that they had had prior to coming to [GAO] . . . or rise to the level of the guarantee that they had when they came to [GAO].

So it was a retention issue, and it was particularly of concern to [Spencer Hays, Executive Chairman of Southwestern *and* CEO of GAO] and others that we . . . retain these people and that they do well. If they weren't functioning well at all, they - - like anyone else, they had to move on, but for those that were . . . working diligently at the business . . . it was allowed to accumulate and move forward.

In some cases, there was the thought that they would . . . be able to retain more business than they [were and that] would have cut back that overdraw amount, but things happen, recessions and so on, and that put them in a [place] sometimes in which they could not meet what their expectations were for a particular territory.

He denied ever advising a representative that he or she did not have to pay an overdraw or the balance held on an 8000 account. He agreed that it was important to retain representatives but that he assumed that overdraws and 8000 account balances would be resolved in time.

Mr. Belli testified that he attended board meetings and was present for discussions concerning the redemption of stock. He stated that funds were taken out of operating capital or profit to redeem stock because Southwestern did not maintain a specific reserve for redemption. He stated that, in general, specific representatives were never "singled out" at board meetings but that a discussion was usually had with respect to whether the company could afford to redeem the stock. He explained that the cash was not available to allow redemption on a yearly basis. He agreed that at times, stock was not redeemed when a "technical issue" was enforced by the board.

Relative to Mr. Belli's individual stock plan, he could not recall whether he ever received a written agreement. He stated that Cindy Johnstone, Vice President and Treasurer of Southwestern and GAO, provided annual reviews of his stock with him individually and with other senior managers. She explained what the stock was worth when it was awarded and how it had grown over a period of time. He later asked for clarification because she retained the reviews and did not provide him with the documents. He understood that following five years of employment, his stock could be redeemed over a five-year period upon his exit from the company. He stated that his initial award of 70,000 shares of stock "trifurcated and became 210,000" shares "a few years" after his initial hire date. He negotiated his stock package with Henry Bedford, CEO and Chairman of the Board of Southwestern *and* GAO. He claimed that the stock plan was a "major" reason for his decision to join GAO but that his understanding of the agreement was later questioned by Mr. Hays in 2010.

Mr. Belli testified that at a meeting in 2010, Mr. Hays advised him that he could earn 210,000 shares if he stayed with GAO for another 10 years. He explained that he believed he had already earned said shares and that Mr. Hays became "perturbed" when he indicated as such in the meeting. He stated,

> [S]uddenly I was confronted with the fact that unlike the rest of my team and everybody else at [GAO] who had received or earned stock, I was being told that the 210,000 shares that I had received and had reviews about were suddenly being represented to me as something that I would have to earn over the subsequent 10 years.

He stated that he left the meeting "wondering where [he] stood with regard to the stock that I had earned and had been reviewed with me each of the previous years by [Ms. Johnstone and Mr. Bedford]." He continued,

> Well, I had been trying to formalize [my agreement] with [Mr. Bedford] for some time, and everybody was being very squirrely about it and never would really meet with me and discuss that.
>
> I can't recall whether I immediately or in the weeks that followed talked to [Mr. Bedford] about it, but I explained to [Mr. Hays] that that's what had happened, and [that] I had never been in a situation like this before.
>
> I had been fortunate in working with the other companies that I work with where promises made were always promises kept, and . . . I was counting on that stock as part of my retirement.

He provided that Mr. Hays advised him that the current offer of 210,000 shares for an additional 10 years of employment was all that was available to him.

Mr. Belli stated that his separation agreement was dependent upon the participation and acquiescence of two other members of the initial team, Ms. Laise[16] and Kurt Gengenbach.[17] He explained, "[T]he three of us were lumped together, and if one

---

[16] He provided that Ms. Laise worked in sales administration at GAO.

[17] His separation agreement was admitted into evidence as an exhibit. His agreement provided as follows:

> [Mr. Belli] agrees he has never been awarded or owned any stock or options in [GAO] or [Southwestern] and further agrees that he does not have any rights to or interest in any stock or stock options of [GAO] or [Southwestern].

didn't agree, nobody else would be paid." He ultimately accepted an agreement that was not the amount promised in terms of stock because he believed his failure to accept would "be a hardship" on the other members.

Mr. Hays[18] testified by deposition that he currently has a business interest in and holds various titles in the following companies: Southwestern, GAO, Tom James Company, and Athlon Sports. He testified in detail concerning his long-time involvement with Southwestern and the creation of GAO. He served as the Executive Chairman of the Board of Directors for Southwestern *and* CEO of GAO. He stated that those coming from QSP to develop the magazine division for GAO were asked to sign a contract indicating that they would honor their non-compete with QSP upon his or her hiring with GAO. He agreed that those employees were also required to divulge their current contacts and territories at QSP to ensure that those contacts and territories were not targeted for sales during the non-compete period.

Mr. Hays provided that he spent time with Employee in his sales territory in an attempt to secure a fundraising client. He agreed that a preexisting relationship is beneficial to securing clients in the fundraising business.

Mr. Hays stated that the Board of Directors for Southwestern decides whether to redeem shares in the stock program based upon a consideration of a number of factors, including whether such redemption would pose a hardship on the company, whether it is in the best interest of the company, and whether the former employee has harmed the company. He stated that the Board decided not to redeem Employee's shares based upon the aforementioned factors, specifically because he negatively affected the company by competing, by failing to fulfill his financial obligations, and by requesting payment for work allegedly completed to secure business for Fall 2011. He provided that Southwestern has redeemed stock for other employees and that since 1982, it has redeemed approximately $117,651,401 in stock.

Mr. Brigman's testimony from his trial was admitted as an exhibit. His recruitment and tenure with GAO was remarkably similar to that experienced by Employee. He too met with Mr. Ring and Ms. Laise in Nashville while still employed by QSP in 2003. He was also specifically told that he would not be held financially responsible for his 8000 account and was assured he would "be taken care of." He was promised a guaranteed income, a 25 percent commission on magazine sales, a growth bonus, and a car allowance program, along with other incentives. Thereafter, he received statements documenting his balances on his commission and 8000 accounts. He questioned Ms. Laise, who told him he was not responsible for the charges. He later

---

[18] Mr. Hays passed away during the pendency of this litigation on March 1, 2017.

made a one-time payment of $11,000 on his 8000 account balance because he was threatened with the loss of employment.

Mr. Brigman further testified that the Pay Plans did not reflect his actual commission percentages. He explained that his commission percentages were higher than what was reflected in the Pay Plans until 2008 or 2009 when GAO slowly increased the commission rate for all employees. He further claimed that 8000 account charges were not part of the deal for the "first few" people who left QSP to start the magazine division at GAO. He claimed that prior to 2010, he was unaware that GAO intended to apply bonuses and other income to his 8000 account balance. He believed that his initial employment agreement afforded him a guaranteed income for at least two years and that the agreement could only be changed by an "executed written document". He provided,

> I had already been told my income would never go down, I didn't have to worry about it. I was the one that came there. It was a good deal for them. I brought them, again, a multi-million dollar product line. And so for them to guarantee me an income for the length of time I was there was a very, very lucrative deal for them.

He explained that his income was not solely based on his production because he had other responsibilities. He agreed that he received the periodic Pay Plans but alleged that he "[t]ossed them to the side" because they did not apply to him.

Relative to the stock program, Mr. Brigman's experience was also similar to Employee's. Mr. Brigman claimed that he was told that his stock options could make him a millionaire. However, he was never provided with a copy of the private offering memorandum or other documentation of the particulars of the stock plan when it was advertised at national sales meetings. He was also never advised that Southwestern could refuse to redeem his stock if he were terminated or resigned from GAO.

Sandy Harris, another former QSP turned GAO representative, testified by deposition that he has known Employee for approximately 32 years. He explained that he was mentored by Employee's father when he first entered the fundraising business as a QSP representative in 1981. He later joined GAO after speaking with Mr. Brigman and others who had resigned from QSP. He recalled that Ms. Laise called him to discuss his potential employment with GAO and that he later interviewed with Mr. Ring and was hired. He testified that some schools may sign a program agreement but then fail to follow through with the fundraiser as agreed. He provided that GAO did not then require compliance with the agreement or pursue legal action against the school.

Mr. Harris stated that he participated in the stock program while employed by GAO. He later sold the stock back to Southwestern and received payment within three or four months of his request for redemption. Mr. Harris testified that he was still working for GAO as a co-manager with Chris Plummer prior to Employee's resignation in 2011. He explained that he was nearing retirement age when he was paired with Mr. Plummer to "help ease [Mr. Plummer] into the job and ease [himself] out of the job." He recalled that he managed Employee during that time period and that the current president of GAO, John Davis, asked him to determine whether Employee planned to stay with GAO. He provided that he too was concerned about Employee's intentions because Mr. Brigman and others had resigned around that same time period in March 2011. At Mr. Davis's direction, he questioned Employee's intentions concerning his tenure with GAO. He provided that Employee assured him of his intent to remain employed by GAO; however, Employee later resigned. He attempted to schedule various meetings between Employee and those in leadership positions for the purpose of enticing Employee to remain with GAO. His efforts proved unfruitful.

The trial court failed to issue an opinion within a year and a half following the final day of trial in January 2015. The Supreme Court advised the trial court, on September 23, 2016, that it would issue a mandamus requiring completion if the court did not issue a ruling by the close of business on September 26. Thereafter, the court issued a ruling, finding in favor of Employee and providing the following credibility determination.

> The Court finds after observing [Employee's] demeanor and testing it against the other evidence, that [he] was a credible witness. The Court believes that [he] was telling the truth about his expectations at GAO based on representations, the post-hiring representations that he did not have to worry about the [commission] and 8000 accounts, and the reasons that he made the lump sum payment.

> The Court concludes that GAO made the representations (through its representatives) to [Employee] that he would not have to pay any outstanding balances that might accrue on his [commission] and 8000 Accounts and that his salary would never decrease to induce him to come to GAO to work. [Employee] paid a substantial lump sum on his GAO accounts under threat of discharge. GAO put him in the position of either paying a lump sum or forfeiting a job that paid substantially more than that annually. [Employee] chose the former.

In dismissing the breach of contract claim, the court found as follows:

Here, although GAO is insisting on strict enforcement of its right to recover substantial amounts of money against [Employee] by virtue of [his] 8000 and commission accounts, it failed to take the necessary steps [to close the loop] on this potential contractual right. The use of the word "executed" in various parts in the Employment Agreement called particular attention to how it was used in various parts of the contract. Subsequent pay plans prepared by GAO were not in the same form as the original Exhibit "A" to the Employment Agreement in two important ways: 1) the body of the subsequent pay plans were not in the same form; and 2) the original Exhibit "A" had a place for the parties to sign it. Given that it is undisputed that GAO drafted the Employment Agreement and the original and subsequent pay plans, the Court determines that the original Employment Agreement was never supplemented by legally enforceable pay plans. The Court concludes, therefore, that the original Employment Agreement remained as it was when the Employment Agreement was signed until it was terminated when [Employee] left GAO.

The court further found that GAO failed to timely reconcile the accounts and assured him that he "did not have to worry" about the 8000 account. The court held that Employee was not liable pursuant to the doctrine of quantum meruit because GAO "never did take the actual steps to close the loop on the version of the employment agreement it is asserting in the lawsuit." The court further found that that Employee had "engaged in a minimal amount of competitive conduct" while still employed but that GAO failed to prove that it suffered damages as a result of this competitive conduct.

Relative to Employee's counter-complaint, the court held that Employee was entitled to redemption of his stock and ordered GAO to direct Southwestern to pay the current fair market value of the stock. The court noted that GAO had the apparent authority to direct Southwestern to do so because GAO had previously "engaged in conduct that prevented [him] from being able to redeem his stock." The court held that Employee's remaining claims were not cognizable but failed to issue findings of fact in support of its conclusion. This timely appeal followed.

## II.    ISSUES

We consolidate and restate the issues on appeal as follows:

A.    Whether the court abused its discretion in considering statements made by Ms. Laise before and after Employee's hiring.

B.    Whether the court erred in dismissing the breach of contract claim.

C.	Whether the court erred in dismissing the quantum meruit claim.

D.	Whether the trial court erred in ordering GAO to redeem stock purchased from its parent corporation, Southwestern.

E.	Whether the trial court erred in failing to award damages proximately caused by Employee's breach of his duty of loyalty to GAO.

## III.	STANDARD OF REVIEW

This case was tried by the court without a jury. On appeal, the factual findings of the trial court are accorded a presumption of correctness and will not be overturned unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d). The trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

In this case, it is necessary to construe the Employment Agreement. The interpretation of written agreements is a matter of law to be reviewed de novo on the record according no presumption of correctness to the trial court's conclusions of law. *See Guiliano v. Cleo*, Inc., 995 S.W.2d 88, 95 (Tenn. 1999). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011).

## IV.	DISCUSSION

### A.

GAO claims that Ms. Laise's statements to Employee were inadmissible hearsay and should not have been considered by the trial court. GAO provides that the court never issued a ruling on its hearsay objection prior to its issuance of the opinion. "Generally, the admissibility of evidence is within the sound discretion of the trial court." *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 131 (Tenn.2004). "The trial court's decision to admit or exclude evidence will be overturned on appeal only where there is an abuse of discretion." *Id.* Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence *to prove the truth of the matter asserted.*" Tenn. R. Evid. 801(c) (emphasis added). Hearsay is inadmissible in trial court proceedings unless it falls within one of the recognized exceptions to the

hearsay rule. Tenn. R. Evid. 802; *Mitchell v. Archibald*, 971 S.W.2d 25, 28 (Tenn. Ct. App. 1998).

We hold that Ms. Laise's statements were not inadmissible as hearsay because said statements were not offered to prove the truth of the matter asserted, namely that Employee actually had a guaranteed income that would never decrease or that he was not liable for the balance on his commission and 8000 accounts. Rather, the statements were submitted to prove that assurances were made and to establish Employee's reliance upon the same, despite his receipt of account statements indicating otherwise.

Next, GAO claims that said statements were not binding on GAO when Ms. Laise did not possess the requisite authority to make such statements on its behalf. We find this argument disingenuous. Despite claims to the contrary, the evidence presented was insufficient to establish that Ms. Laise played a minimal administrative role at GAO without authority. Indeed, the record reflects that she received a salary of approximately $150,000 per year in 2002 and that her pay increased to $165,000 per year in 2007 and to $173,250 in 2008. She also participated in the stock program, beginning in 2008. Her direct supervisor was also listed as Henry Bedford, the Chief Operating Officer at the time who later became the Chief Executive Officer. Further, testimony presented established that she was an integral part of the hiring process for the QSP employees hired by GAO to develop the magazine division and that she was responsible for developing suggested Pay Plans and offers of employment.

Lastly, GAO claims that said statements were not binding and that Employee could not have justifiably relied upon them because the Parties' course of dealing after the alleged statements were made was consistent with the terms of the Pay Plans. We disagree. The record reflects that the yearly Pay Plans were not applicable to Employee until, at the very earliest, the 2008 fiscal year. Following 2008, the 8000 account was not reconciled on a monthly or even yearly basis as provided for in the Pay Plans. The commission account was also not reconciled on a yearly basis. Accordingly, we conclude that the court did not abuse its discretion in considering the statements and assurances made by Ms. Laise.

B.

GAO argues that the court erred in denying its breach of contract claim when the Employment Agreement was modified pursuant to the Pay Plans that were "comparable in form" as required. GAO claims that the court erroneously read a provision into the contract requiring the parties to sign the Pay Plans. GAO notes that the agreement prohibits a waiver or modification unless it is in writing and signed by the parties. Employee responds that he never signed any of the Pay Plans allegedly incorporated into

the original agreement and that the record is devoid of evidence establishing that he received notification of the Pay Plans. He requests reimbursement of his $14,000 payment made under duress and additional damages based upon his justifiable reliance on representations made to him regarding a guaranteed salary.

The cardinal rule of contract interpretation is that the court must attempt to ascertain and give effect to the intention of the parties. *Christenberry v. Tipton*, 160 S.W.3d 487, 494 (Tenn. 2005). In attempting to ascertain the intent of the parties, the court must examine the language of the contract, giving each word its usual, natural, and ordinary meaning. *Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn. Ct. App. 1996). "If the language of the contract is unambiguous, the Court must interpret it as written rather than according to the unexpressed intention of one of the parties. *Courts cannot make contracts for parties but can only enforce the contract which the parties themselves have made.*" *Pitt v. Tyree Org. Ltd.*, 90 S.W.3d 244, 252 (Tenn. Ct. App. 2002) (internal citations omitted) (emphasis added). However, the court may consider the situation of the parties, the business to which the contract relates, the subject matter of the contract, the circumstances surrounding the transaction, and the construction placed on the contract by the parties in carrying out its terms. *See Penske Truck Leasing Co., L.P. v. Huddleston*, 795 S.W.2d 669, 671 (Tenn. 1990); *Minor v. Minor*, 863 S.W.2d 51, 54 (Tenn. Ct. App. 1993).

As pertinent to this appeal, the Employment Agreement provided as follows:

Compensation

(a)    For all services rendered by Employee under this Agreement, [GAO] shall compensate him/her in accordance with the Compensation Schedule which is attached hereto as Exhibit A, and which shall be deemed for all purposes to be an integral part of this Agreement.

(b)    Each fiscal year during the term of this Agreement, [GAO] shall cause to be executed in writing a new Compensation Schedule and Sales Representative's Pay Plan, effective July 1 of the new corresponding year, indicating the amount of compensation and the method for payment of said compensation for the services of Employee during the following fiscal year beginning July 1st. The new Compensation Schedule shall be considered a part of this Agreement and shall be known as Exhibit A for the corresponding year. In conjunction with each new fiscal year, [GAO] will advise Employee of *his/her applicable Pay Plan to be set forth in a written Notification given in accordance herewith comparable in form to the Addendum made a part hereof.*

The terms of the Employment Agreement were not ambiguous; however, the Parties failed to adhere to said terms. The record reflects that the Pay Plans were not "comparable in form" to the original compensation schedule. The Pay Plans relied upon by GAO provided the method of payment but did not set forth the amount of compensation as required by the Employment Agreement. Further, many of the terms contained in the Pay Plans did not apply or were not followed by the Parties. Accordingly, we agree that GAO cannot prevail on its breach of contract claim because the Employment Agreement was never supplemented by legally enforceable Pay Plans.

However, we deny Employee's claim for reimbursement of his lump-sum payment of $14,000 on the 8000 account or any additional damages regarding the use of the commission and 8000 accounts. While the Parties did not operate pursuant to a legally enforceable Pay Plan, Employee acquiesced in his payment of $14,000 and other salary reductions and payroll deductions to reconcile his accounts in exchange for continued employment. He cannot now claim an entitlement to a reimbursement of these funds.

C.

GAO alternatively requests judgment on its quantum meruit claim. GAO again asserts that Employee's reliance upon Ms. Laise's assurances was unreasonable and claims that it did not waive its right to collect when it mailed invoices and statements documenting Employee's balances on the accounts. "Actions brought upon theories of unjust enrichment, quasi contract, contracts implied in law, and quantum meruit are essentially the same." *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 154 (Tenn. 1966). The terminology is frequently employed "interchangeably to describe that class of implied obligations where, on the basis of justice and equity, the law will impose a contractual relationship between the parties." *Id.* Our Supreme Court summarized the elements of a quantum meruit claim as follows:

(1)     There is no existing, enforceable contract between the parties covering the same subject matter;

(2)     The party seeking recovery proves that it provided valuable goods or services;

(3)     The party to be charged received the goods or services;

(4)     The circumstances indicate that the parties to the transaction should have reasonably understood that the person providing the goods or services expected to be compensated; and

(5)     The circumstances demonstrate that it would be unjust for a party to retain the goods or services without payment.

*Doe v. HCA Health Servs. of Tennessee, Inc.*, 46 S.W.3d 191, 197-98 (Tenn. 2001) (internal quotation and citations omitted). "The most significant requirement for a recovery on quasi contract is that the enrichment . . . be unjust." *Paschall's, Inc.*, 407 S.W.2d at 155. "The doctrine of unjust enrichment is founded upon the principle that someone who receives a 'benefit desired by him, under circumstances rendering it inequitable to retain it without making compensation, must do so.'" *CPB Mgmt., Inc. v. Everly*, 939 S.W.2d 78, 80 (Tenn. Ct. App. 1996) (quoting *Lawler v. Zapletal*, 679 S.W.2d 950, 955 (Tenn. Ct. App. 1984)).

The circumstances presented here do not indicate that the Parties understood that Employee was liable for the commission and 8000 accounts given Ms. Laise's statements at the time of Employee's hiring and her assurances thereafter. The Parties also did not operate in accordance with the Pay Plans. Further, the circumstances presented here do not support a finding of unjust enrichment when Employee provided specific skills and services to grow the magazine division at GAO while sacrificing his existing sales territory to train others in the business for GAO's benefit. With these considerations in mind, we affirm the denial of GAO's unjust enrichment claims.

D.

GAO claims that Employee never sought redemption of his stock but requested a judgment for consideration paid and interest.[19] Further, GAO argues that Southwestern provided the required disclosures and advised Employee that it had no obligation to redeem the stock. Finally, GAO claims that it was without authority to direct its parent company to redeem the stock as directed by the trial court. Employee claims that he is entitled to treble damages, punitive damages, and attorney fees because the operation of

---

[19] A review of the counter-complaint reveals that Employee pled sufficient facts to support a claim of redemption and also sought "such other further general relief to which [he] may be entitled." Further, the proof presented at trial supported a claim for redemption. Accordingly, we conclude that the relief granted was within the scope of the pleadings and the proof. *See generally Britt v. Massengill*, No. W1999-01129-COA-R3-CV, 2001 WL 204209, at *3 (Tenn. Ct. App. Feb. 26, 2001) (acknowledging that courts of equity have the authority "to grant relief liberally under the general prayer for relief," within reason).

the stock plan was unfair and deceptive. He further claims that GAO's conduct was willful and knowing as evidenced by its denial of the benefits of stock ownership to others.

We first affirm the denial of any fraud-based claims based upon the purchase and operation of the stock plan because the record confirms that Southwestern provided the required disclosures and advised Employee that it had no obligation to redeem the stock. The private offering memorandum provided as follows:

> If for any reason (including death or disability), an Option holder's employment with the Company is terminated, whether by the Option holder or by the Company, the Company shall have an option to purchase, but is not required to purchase, the Shares of the Option holder.[20]

Additional documentation was also introduced and admitted into evidence establishing that Employee was further advised that Southwestern had no obligation to repurchase the stock upon an employee's termination. We further agree that GAO does not hold the requisite authority to direct its parent company to redeem the stock and we, therefore, reverse the court on this issue. However, Ms. Johnstone testified that Southwestern routinely offset the value of former employees' stock by amounts owed on the commission and 8000 accounts *as indicated by GAO*. Accordingly, we hold that if Southwestern exercises its option to repurchase, then GAO must approve the repurchase without offsetting the value of the stock by amounts allegedly owed on the commission and 8000 accounts in light of our holding that Employee is not liable for the balances held on the accounts.

E.

GAO argues that Employee's competitive conduct while still employed amounted to a breach of his duty of loyalty contained in the Employment Agreement and that the court erred in denying its claim for damages. Employee responds that the record is devoid of proof establishing that he diverted business to himself while still employed or that he unlawfully prepared for his departure from GAO.

In order to prevail in a breach of contract case, a plaintiff must prove "the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach." *Federal Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011) (citing *ARC LifeMed, Inc. v. AMC-Tenn., Inc.*, 183 S.W.3d 1, 26

---

[20] The Company is defined as Southwestern.

(Tenn. Ct. App. 2005)). Here, the Parties agreed that a valid contract existed in the form of the original Employment Agreement, which provided, in pertinent part, as follows:

> 6. <u>Duty of Loyalty</u>. [GAO] asserts and [Employee] hereby acknowledges and agrees if [Employee] competes or prepares to compete directly or indirectly against [GAO] or any of its affiliates during the course of the agreement, or fails to dedicate his or her best efforts and full time to performing for [GAO] in accordance herewith because he/she is starting a new business or helping another start up or operate another business during the course of this agreement, then [Employee] will be liable to [GAO] for breach of loyalty in any instance.
>
> * * *
>
> 8. <u>Breach</u>. Employee acknowledges that [GAO] will have no adequate remedy at law if Employee violates any of the terms hereof, and in particular, but without limitation, paragraphs 4, 5 and 6 hereof. In such event, [GAO] shall have the right, in addition to any other rights it may have, to obtain in any court of competent jurisdiction equitable or other extraordinary relief including injunctive relief to restrain any breach or threatened breach hereof or otherwise to specifically enforce any of the provisions hereof. In the event [GAO] resorts to legal action to enforce this Agreement or to recover damages caused by Employee, Employee will be responsible and liable for reasonable attorneys' fees and costs of court incurred by [GAO] in such legal action. These remedies are not exclusive and [GAO] has the right to seek and receive any other legal remedies that are applicable and available under the circumstances. If legal action is pursued, Employee WAIVES ALL RIGHTS TO A JURY TRIAL on the issues made the basis of said legal action.

The court agreed that Employee had engaged in a "minimal amount" of competitive conduct in violation of the Employment Agreement but that GAO failed to establish that it suffered damages as a result of the breach. We disagree.

This court has held previously that "an employee who breaches the duty of loyalty may be required to surrender any compensation paid by the employer during the period of the breach." *Efird v. Clinic of Plastic & Reconstructive Surgery, P.A.*, 147 S.W.3d 208, 220 (Tenn. Ct. App. 2003). Further, "an injured party may recover lost anticipated profits when their nature and occurrence have been established with reasonable certainty." *Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d 42, 58 (Tenn. Ct. App. 2004) (citations omitted). "This 'reasonable certainty' standard applies

to evidence regarding the *existence* of damages," not the "*amount* of damages." (citing Waggoner, internal citation omitted). *Tennison Brothers v. Thomas*, No. W2016-00795-COA-R3-CV, 2017 WL 6403888, at *17-18 (Tenn. Ct. App. Dec. 15, 2017) (citing *Waggoner*, 159 S.W.3d at 58). "Once an injured party proves that it has been damaged, the amount of the damages need not be proved with certainty or mathematical precision." *Waggoner*, 159 S.W. 3d at 58 (citation omitted). "The amount of lost profits damages may be based upon estimates." *Id.*

At trial, GAO claimed entitlement to $15,000 in unearned compensation paid during Spring 2011 and lost profits as calculated by its CFO, Mr. Underwood. In calculating lost profits, Mr. Underwood used the following three different methodologies:

- First, Mr. Underwood compared the 38 program agreements Employee obtained for GAO in Fall 2010 with the program agreements he obtained for GAO in Fall 2011, resulting in lost profits of approximately $99,215.33.

- Next, Mr. Underwood compared the program agreements obtained for QSP by Treasure Leaf in Fall 2011 with the program agreements obtained for GAO on the same accounts in Fall 2010, resulting in lost profits of approximately $63,946.60.

- Finally, Mr. Underwood determined that Treasure Leaf generated approximately $637,000 in gross commissionable sales for Fall 2011, resulting in lost profits for GAO of approximately $105,869.40. He explained that he converted the estimated gross sales to net sales by subtracting the 40 percent profit that is customarily awarded to schools based upon the industry standard. He then estimated the lost profits caused by Employee based upon a contribution margin of 27.7 percent.

The record reflects that Employee concocted a plan to leave GAO with Mr. Coley in March 2011, began speaking with QSP in April, provided QSP with a list of his clients and sales estimates on April 14, and then signed an independent distributor agreement with QSP on May 18, a month before his resignation. Employee submitted a few program agreements for GAO in Spring 2011 but then submitted 12 program agreements for QSP within four days of his resignation.

These facts establish, at the very least, that Employee was preparing to compete and failed to dedicate his best efforts while still employed by GAO, thereby establishing GAO's entitlement to reimbursement of unearned compensation in the amount of $15,000, plus attorneys' fees and costs in accordance with the terms of the Employment

Agreement. However, we further conclude that GAO's claim for lost profits was disproven by the nature of the fundraising business. The testimony presented established that the program agreements were not binding in nature and that the attrition of clients was an anticipated event when a representative moved to a different employer, with or without an accompanying breach of contract, as evidenced by GAO's solicitation of QSP's employees to develop the magazine division. We simply cannot hold that the lost profits were a result of Employee's breach of loyalty.

## V.  CONCLUSION

The judgment of the trial court is reversed, as to the court's holding regarding the stock account and as to the denial of damages for Brad Patterson's breach of loyalty. The judgment is affirmed in all other respects. We remand for the collection of damages and the assessment of attorney fees and costs pursuant to the terms of Employment Agreement. Costs of the appeal are taxed one-half to the appellant, Great American Opportunities, Inc.,  and one-half to the appellee, Brad Patterson.

_____
JOHN W. McCLARTY, JUDGE